UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARK A. ZANDBERG,

    Plaintiff,

v.

EDMONDS HIGH SCHOOL DISTRICT NO. 15; BRIAN HARDING; and MARLA MILLER,

    Defendants.

CASE NO. C08-0570-JCC

ORDER

This matter comes before the Court on Defendants' Motion for Summary Judgment (Dkt. No. 22), Plaintiff's Response (Dkt. No. 27), Defendants' Reply (Dkt. No. 29), Plaintiff's Opposition to Defendants' Motion to Strike (Dkt. No. 31), and Defendants' Reply in Support of their Motion to Strike (Dkt. No. 33). The Court has carefully considered these documents, their supporting declarations and exhibits, and the balance of relevant materials in the case file, and has determined that oral argument is not necessary. For the reasons explained below, the Court finds and rules as follows.

**I.    BACKGROUND**

Plaintiff Mark Zandberg brings this civil rights action alleging violation of his First Amendment rights and wrongful discharge in violation of public policy. The lawsuit arises from communications made

ORDER – 1

by Plaintiff while he was employed by Defendant Edmonds School District (the "District") and supervised by Defendant Marla Miller.[1] Plaintiff worked for the District as the Planning and Property Management Specialist between March 2001 and June 2007.

Two of Plaintiff's communications provided the basis for the District's actions that ultimately gave rise to Plaintiff's suit. First, on March 19, 2007, Plaintiff sent an email to the Snohomish County Sheriff's Office titled "Criminal Destruction of Public Property." (March 19 email (Dkt. No. 23-4).) In that email, Plaintiff expressed concern about a 28-year-old white male named "Carl" who frequently entered the District's property. (*Id.*) Plaintiff reported that he had confronted Carl on District property and asked Carl to stay away. (*Id.*) He then suggested that Carl was "in desperate need of constructive guidance and a visit from crime prevention or any uniformed police officers would be warmly welcomed." (*Id.*) Plaintiff concluded by asking, "[o]n behalf of Edmonds School District," that the Sheriff's office dispatch officers to "chat" with Carl at his residence. (*Id.*)

Second, on March 22, 2007, the *Edmonds Beacon*, a local Edmonds newspaper, published a letter Plaintiff had written to the editor, in which he criticized the legal action brought by a group of Edmonds citizens against the City of Edmonds. (March 22 Letter (Dkt. No. 23-5).) The group alleged that, in developing new park space, the City had purchased less property than it should have from the District. (*See id.*) Plaintiff opened his letter by stating, "As a resident of Edmonds, I find it deeply disturbing that I share such citizenship with the buffoons behind the legal action levied against the City of Edmonds." (*Id.*) Plaintiff then informed the readers, "The Edmonds School District was under no obligation to sell any portion of the site to the City. It was only through exceptionally resourceful cooperation that the deal came together for the benefit of the public." (*Id.*) He concluded by suggesting that the City "deport" those behind the legal action "to a City better equipped to deal with the mentally disturbed—like Lynwood." (*Id.*)

---

[1] On January 6, 2009, the Court granted Plaintiff's request to voluntarily dismiss Brian Harding as a defendant in this action. (Dkt. No. 21.)

ORDER – 2

Following the publication of that letter, the District received a complaint from an Edmonds resident, who stated, "Your employee Mark Zandberg has made some very disturbing and without fact accusations." (March 25 email (Dkt. No. 23-6).) The citizen was concerned that the District's employee had made accusations and used labels "totally inappropriate for a public employee," especially since Plaintiff had apparently been involved in the transaction at issue. (*Id.*) The District later received another complaint about Plaintiff's letter to the editor. (*See* Dkt. No. 23-7.)

The District became concerned about the potential for confusion as to whether Plaintiff's letter represented the District's views on the matter. (March 26 email (Dkt. No. 28-2 at 5).) The District was concerned that Plaintiff's letter could be attributed to it because Plaintiff was generally known as its employee and because the letter made declarative statements suggesting that Plaintiff had inside knowledge of the transaction at issue. (Miller Dep. 35:10–19 (Dkt. No. 23-37 at 5).) Additionally, because the District had sold the property at issue to the City of Edmonds and had been involved in contentious negotiations regarding the sale, it was concerned that Plaintiff's letter would invite further controversy. (*Id.* at 33:21–35:25.)

To address these concerns, the District sent a response letter to the Editor of the *Beacon* clarifying that Plaintiff's letter was an expression of his personal opinion and did not represent the views of the District. (Resp. Letter (Dkt. No. 23-40); *see* March 26 email (Dkt. No. 28-2 at 5).) In addition, on March 26, 2007, the Director of Facilities Operation (and Plaintiff's direct supervisor), Brian Harding, requested that Plaintiff meet with him and Assistant Superintendent, Marla Miller, to discuss both the letter to the *Beacon* and the email to the Sheriff's Department. (March 26 Letter (Dkt. No. 23-8).) Plaintiff was invited to bring a union representative if he so desired. (*Id.*)

On March 27, 2007, Plaintiff, with his union representative, met with Mr. Harding and Ms. Miller. (Blankenship Decl. ¶ 6 (Dkt. No. 24 at 1–2).) On March 29, Harding issued a Letter of Direction to Plaintiff that memorialized the substance of the meeting. (Letter of Direction 1 (Dkt. No. 23-9).) After recounting Plaintiff's and the District's views on the email to the Sheriff's Department and the letter to

ORDER – 3

the *Beacon*, Harding stated:

> Edmonds School District respects the right of individual employees to express personal opinions, but also expects employees to clearly distinguish personal opinion from communication on behalf of the district. To establish clear parameters for future communications pertaining to District matters, I am directing you to comply with the following instructions.
>
> 1. In the future you are to state clearly when you express your personal opinion regarding District matters that you speak only for yourself and not for Edmonds School District.
>
> 2. If you choose to express your personal opinion about matters involving the district, you are to take care you do not include information to which you have privileged access through your employment with the District that would not be available to the general public.
>
> 3. Until further notice, any communication you prepare on behalf of Edmonds School District is to be approved, in advance of distribution, by me. In my absence, such communication must be approved by Marla Miller, Assistant Superintendent.

(*Id.* at 2.) The letter concluded by stating, "Should you fail to follow these parameters in future communications regarding District matters, the District may take disciplinary action up to and including termination of employment." (*Id.*) Harding hand-delivered the letter to Plaintiff and asked him if he had any questions. (Harding Dep. 68:4–21 (Dkt. No. 23-38 at 3).) After briefly reading the letter and signing it, Plaintiff responded that he did not have any questions. (*Id.*)

Later that same day, Plaintiff sought clarification regarding the directives in the letter. (*See* March 29 clarification emails (Dkt. No. 23-18).) Plaintiff sent Harding an email asking if the intent of the Letter of Directive was to require preapproval for "all communications on behalf of the Edmonds School District, or just communication with non-District individuals and agencies." (*Id.*) Harding promptly responded and informed Plaintiff, "I do not have a problem with you responding to normal daily traffic items. Just run the [communications] leaving the district by me first." Harding also indicated that he was not concerned about a "housekeeping communications" or a communication that does not lend itself to "editorializing." (*See id.*) Harding concluded by asking, "Is this adequate clarification?" (*Id.*) Plaintiff apparently accepted the clarification and did not respond with additional questions at that time. (*See id.*;

ORDER – 4

Resp. 4 (Dkt. No. 27 at 4).)

Just before 5:00 p.m. that day, Plaintiff wrote an email to Harding and Miller. (March 29 authorization emails (Dkt. No. 28-2 at 12–13).) He requested approval for an attached communication and asked whether Harding or Miller would be attending the PTA meeting scheduled for 9:00 a.m. the next morning. (*See id.*) Miller responded around 6:00 p.m. informing Plaintiff that Harding was in a meeting all afternoon and then off for vacation. (*Id.*) Miller also expressly approved Plaintiff's attached communication and indicated that he could handle the PTA meeting alone. (*See id.*) Plaintiff apparently did not receive Miller's response until after the meeting. (Zandberg Dep. 65:1–16 (Dkt. No. 28-4 at 59).)

The next morning, Friday, March 30, 2007, Plaintiff met with the PTA to discuss a playground construction project. (*Id.* 65:1–4.) Out of an apparent concern of his compliance with the Letter of Directive, Plaintiff had the PTA members sign a statement he drafted acknowledging their understanding that he was communicating with them in his personal capacity and not on behalf of the District. (*Id.* at 65:24–66:7; Disclaimer Letter (Dkt. No. 23-13).) He then gave the signed statement to Miller along with a request for one-hour of personal leave for his time at the PTA meeting. (*See* Dkt. No. 23-14.)

Later that Friday, Plaintiff wrote a letter to his supervisors expressing his belief that the District was attempting to silence his free speech. (March 30 Letter (Dkt. No. 23-16).) He also expressed concern that the Letter of Directive made it difficult for him to effectively perform the day-to-day functions of his job. (*Id.*) He stated that he was "providing an opportunity for the District to retract the Letter of Direction." (*Id.*) On Saturday, March 31, Plaintiff emailed Miller, copying Harding. (March 31 email (Dkt. No. 23-10).) He informed Miller that he would no longer be available to cover after-hours pager responsibilities or fulfill the role of back-up Incident Commander during District emergencies "until further notice." (*Id.*) Plaintiff stated his belief that the Letter of Directive prevented him from properly performing these duties because they required communicating on behalf of the District, which was not feasible unless Miller was "standing right beside me during emergencies, clearing every word I utter." (*See id.*) Plaintiff then began his scheduled three-week vacation on Monday, April 2, 2007.

ORDER – 5

On April 4, 2007, Miller responded to Plaintiff's March 30 and 31 correspondence. (April 4 email (Dkt. No. 23-11).) She stated that it was her understanding that Plaintiff was currently on a three-week vacation, which began April 2, and that he would have no occasion to communicate on behalf of the District while on vacation. (*Id.*) Miller further stated, "When you return, I will be happy to meet with you to review your concerns with the direction you've received." (*Id.*)

After Plaintiff returned to work, he began seeking approval for a number of seemingly mundane communications. For example, on April 25, Plaintiff forwarded to Harding for approval a draft of an email he wrote to schedule a meeting date. (April 25, 26 emails (Dkt. No. 28-2 at 15).) Harding's response indicated that approval for that email was not required. (*See id.*) After receiving a number of such requests, Harding responded to Plaintiff with further clarification on the Letter of Directive:

> The drafts that you are sending me are not materials which contain personal editorial comment and do not require my advance approval. The letter of direction was not designed to inhibit your ability to handle the daily function of your position but to provide some guidance regarding the separation between statement of facts and opinions. I trust your ability to discern the difference.

(May 2 emails (Dkt. No. 23-19).) In response, Plaintiff challenged Harding's clarification as inconsistent with the Letter of Direction, (*Id.*), and continued to forward numerous draft communications to his supervisors for approval. On May 4, Plaintiff forwarded for approval an email regarding a shipment delivery. (May 4 emails (Dkt. No. 23-17).) Miller responded and informed Plaintiff that "this type of communication is entirely factual and does not need to be reviewed prior to a response." (*Id.*)

On May 7, 2007, Plaintiff met with Harding and Miller to discuss concerns regarding the statement that Plaintiff had asked the PTA members to sign and his request to rescind the Letter of Direction. (Zandberg Dep. 88:4–17 (Dkt. No. 23-36 at 4).) Plaintiff's union representative also attended the meeting. (*Id.*) Three topics were discussed at that meeting: the statement that Plaintiff had the PTA members sign, clarifications regarding the letter of direction, and a District property transaction about which Plaintiff had apparently expressed concern. (Miller Dep. 86:14–22 (Dkt. No. 28-4 at 40); *see* Zandberg Dep. 89:25–90:25 (Dkt. No. 28-4 at 64–65).) Plaintiff recalls that the thrust of the meeting

ORDER – 6

involved discussion of the disputed property transaction, and that Miller offered only brief clarification on the Letter of Direction. (Zandberg Dep. 90:1–7 (Dkt. No. 28-4 at 65).) Miller recalls that she spent considerable time clarifying for Plaintiff that the Letter of Direction was not disciplinary, but rather intended to provide guidance and an opportunity for his supervisors to review certain communications. (Miller Dep. 84:15–23, 91:6–11 (Dkt. No. 23-37 at 10, 13).) The meeting ended with Plaintiff indicating that it was helpful to get clarification about the purpose of the Letter of Direction. (*Id.* at 93:9–14.)

On May 28, 2007, Plaintiff sent an email to Miller notifying her that his "service to the Edmonds School District will end on June 11, 2008." (May 28 email (Dkt. No. 23-23).) He stated his belief that his employment with the District had been "constructively terminated." (*Id.*) Miller responded on May 30, acknowledging receipt of his notice and expressing confusion about his allegation of constructive termination. (May 30 email (Dkt. No. 23-24).) She informed Plaintiff that he had not been disciplined in any way, but rather given direction in performing his duties. (*Id.*) She also stated that his employment "has not been terminated." (*Id.*) Thereafter, Plaintiff began informing people that his last day of work was June 11, 2007, created an automatic email response stating the same, and missed numerous days of work. (*See* Dkt. Nos. 23-21–22, 23-25–28.) Accordingly, the District accepted Plaintiff's resignation and began planning for his departure. On June 12, 2008, Plaintiff began working for another employer. (Zandberg Dep. 7:8–20 (Dkt. No. 23-36 at 3).)

Thereafter, Plaintiff brought an administrative tort claim against the District, alleging adverse employment action and constructive discharge in violation of public policy under state law and in violation of his federal constitutional rights. The District denied the claim on October 22, 2007, and this action followed. Defendants now move for summary judgment dismissal.

**II.   LEGAL STANDARD**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether an issue of fact exists, the

ORDER – 7

Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323–24.

## III.    ANALYSIS

As an initial matter, Defendants move to strike Plaintiff Exhibits 23–30, claiming that he failed to timely disclose the documents prior to using them in support of his Response. (Reply 1–2 (Dkt. No. 29).) The Court finds, however, that Plaintiff timely produced Exhibits 23 and 24, (*see* 2nd Chen Decl. ¶ 5 (Dkt. No. 32 at 2)); Plaintiff was under no obligation to produce Exhibits 25–28 because he used such documents solely for impeachment purposes, *see* Fed. R. Civ. P. 26(a)(1)(A)(ii); (Resp. 4 n.2 (Dkt. No. 27)); and Plaintiff was not obligated to produce the excerpts from deposition testimony contained in Exhibits 29 and 30 because Defendants had access to such transcripts, (*see* Dkt. Nos. 23-36–38)). Defendants' request to strike Plaintiff Exhibits 23–30 is therefore DENIED.

Plaintiff's Complaint asserts two claims: (1) a federal claim for violation of 42 U.S.C. § 1983, alleging that Defendants retaliated against him for exercising his First Amendment free speech rights; and (2) a state law claim for wrongful discharge in violation of public policy, alleging that Defendants retaliated against him for exercising free speech rights and for engaging in protected whistleblowing activity. (Compl. ¶¶ 26–37 (Dkt. No. 1 at 12–13).) The Court will address each claim in turn, below.

ORDER – 8

### A. 42 U.S.C. § 1983

Plaintiff's federal claim is brought pursuant to 42 U.S.C. § 1983, which provides a private right of action against a person who, acting under color of state law, violates federal constitutional rights. *Jackson v. City of Bremerton*, 268 F.3d 646, 650 (9th Cir. 2001). A local government entity may be held liable as a "person" under section 1983 in certain circumstances. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). A school district may incur section 1983 liability if the plaintiff can show that an authorized final policy-maker undertook or ratified unconstitutional action, or that a district employee violated constitutional rights pursuant to an expressly adopted official policy or a longstanding practice or custom. *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004); *see Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992). The defense of qualified immunity, however, protects an individual defendant from liability for civil damages under section 1983 " when performing discretionary functions, unless such conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Jackson*, 268 F.3d at 650–51. To establish a section 1983 claim against either a municipality or an individual, the plaintiff must demonstrate a deprivation of rights protected by the Constitution or federal statues. *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1986).

Plaintiff's section 1983 claim is premised on his allegation that Defendants retaliated against him for exercising his First Amendment rights. (Resp. 11 (Dkt. No. 27).) "In order to state a claim against a government employer for a violation of the First Amendment, an employee must show (1) that he or she engaged in protected speech; (2) that the employer took 'adverse employment action'; and (3) that his or her speech was a 'substantial or motivating' factor for the adverse employment action." *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003). For purposes of this motion, Defendants acknowledge that Plaintiff engaged in protected speech when he wrote the letter to the Editor of the *Edmonds Beacon* and when he communicated with the state auditor's office. (Mot. 12 (Dkt. No. 12).) Defendants contend, however, that Plaintiff's First Amendment retaliation claim fails because he has not shown that he suffered any "adverse employment action" as a result of his protected speech. (*Id.*). The Court agrees.

ORDER – 9

To establish a First Amendment retaliation claim under section 1983, Plaintiff must show that he suffered "adverse employment action." *See Coszalter*, 320 F.3d at 973; *Nunez v. City of Los Angeles*, 147 F.3d 867, 874 (9th Cir. 1986). An adverse employment action is an action that is "reasonably likely to deter" the employee from engaging in protected speech. *Coszalter*, 320 F.3d at 976. "To constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind." *Id.* at 975. In some cases, however, "the would-be retaliatory action is so insignificant that it does not deter the exercise of First Amendment rights, and thus does not constitute an adverse employment action within the meaning of First Amendment retaliation cases." *Id.*; *see Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1986) (holding that an employer's minor acts, such as "bad-mouthing" and verbally threatening an employee who engaged in protected speech, cannot constitute adverse employment action). Accordingly, the determination of "adverse employment action" involves a case-specific inquiry that turns on whether Defendants' actions were "reasonably likely to deter" Plaintiff from engaging in protected activity under the First Amendment. *See Coszalter*, 320 F.3d at 976. Plaintiff contends that Defendants' issuance of the Letter of Direction and subsequent conduct constitute adverse employment action. (Resp. 11–17 (Dkt. No. 27).) The Court finds, however, that neither the issuance of the Letter of Direction nor Defendants' subsequent conduct rose to the level of "adverse employment action" within the meaning of First Amendment retaliation cases. Even construing the facts in the light most favorable to Plaintiff, Defendants conduct in this case was not "*reasonably* likely to deter" Plaintiff from engaging in protected speech.

1. **Letter of Direction**

The Letter of Direction issued by the District cannot reasonably be interpreted as an "adverse employment action" in retaliation for Plaintiff's exercise of his First Amendment rights. The letter did not prevent or inhibit Plaintiff from expressing his free speech rights. Nor did it discipline or reprimand Plaintiff for his speech. Rather, the letter provided guidance and oversight for Plaintiff when communicating *on behalf of the District*. The District's concerns regarding Plaintiff's communications on

ORDER – 10

District matters arose from his letter to the *Beacon* in which he: (1) referred to Edmonds citizens who were challenging a District-related transaction as "buffoons," (2) suggested that they be "deport[ed] . . . to a City better equipped to deal with the mentally disturbed—like Lynwood," and (3) made declarative statements suggesting he had inside knowledge of the transaction at issue. (*See* March 22 Letter (Dkt. No. 23-5).) The District had legitimate concerns that Plaintiff's letter to the *Beacon* could be misconstrued as representing its views on the disputed District-related transaction. *See Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006) (recognizing that public employees occupy "trusted positions" and when they speak out, "they can express views that contravene governmental policies or impair the proper performance of governmental functions").

From the beginning, Defendants made clear to Plaintiff that he was not being disciplined or reprimanded for his speech. *Cf. id.* at 421 (noting that the First Amendment protects against discipline by an employer in retaliation for protected speech). On March 27, 2007, Plaintiff and his union representative, Mary Blankenship, met with his supervisors, Miller and Harding, to discuss his letter to the *Beacon*. Plaintiff's union representative explains, "From the tone of the March 27th meeting, I did not believe that there was any disciplinary issue involved." (Blankenship Decl. ¶ 8 (Dkt. No. 24 at 2).) Blankenship states that, at the meeting, Miller and Harding attempted to "provide [Plaintiff] guidance for making future communications when acting as a representative of the District." (*Id.* ¶ 6.) The Letter of Direction, which memorialized the substance of the March 27 meeting, confirms Blankenship's description. The letter states that its purpose is to provide Plaintiff with "written parameters regarding [his] future communications regarding matters pertaining to the District." (Letter of Direction 1 (Dkt. No. 23-9).) The letter directed Plaintiff to make clear, in expressing opinions on District matters, when he was expressing his own opinions as opposed to those of the District; and the letter further stated that, until further notice, communications made on behalf of the District were to be approved in advance by Plaintiff's supervisors. (*Id.* at 2.) The letter concluded by stating that failure to comply with its parameters "may" result in disciplinary action. (*Id.*)

ORDER – 11

The requirement that Plaintiff obtain preapproval for communications on the District's behalf did not restrict his free speech rights because, as the Supreme Court has explained, "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Garcetti*, 547 U.S. at 421–22. Rather, such restriction "simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 422. Because the Letter of Direction did not prevent Plaintiff from, or discipline him for, exercising his free speech rights, and only restricted his speech with respect to communications made on behalf of the District, it was not "reasonably likely to deter" Plaintiff's First Amendment rights. The issuance of the Letter of Direction cannot be considered an "adverse employment action" in this case.[2]

### 2. Subsequent Conduct

Similarly, Defendants' subsequent conduct was not "reasonably likely to deter" the exercise of protected speech and therefore did not constitute an "adverse employment action." Plaintiff's supervisors clarified for him on multiple occasions that the Letter of Direction was not disciplinary, but rather was intended to provide oversight for when he expressed opinions on the District's behalf. The same day the letter was issued, Harding informed Plaintiff that preapproval was not required for "housekeeping communications" or "normal daily traffic" communications within the District. (March 29 clarification emails (Dkt. No. 23-18).) Then, in response to Plaintiff's expressed concern that the letter conflicted with the performance of his duties, Miller offered to meet with Plaintiff again to address his concerns. (April 4

---

[2] Federal courts that have examined letters of direction have found that such letters do not constitute "adverse employment action." *Kmetz v. State Historical Soc'y*, 304 F. Supp. 2d 1108, 1130 (W.D. Wis. 2004), *overruled in part on other grounds*, No. 03-C-107, 2004 WL 298102 (W.D. Wis. 2004); *see Guse v. Alhambra School Dist. No. 68*, No. 04-2666, 2007 WL 1810504, *4–6 (D. Ariz. June 22, 2007). In *Kmetz*, the court explained that even though the employee stated that he thought the letter of direction was disciplinary, such a belief was not reasonable because the employer told him that the letter was not intended to be disciplinary and would not be placed in his disciplinary file. 304 F. Supp. 2d at 1130. A Washington court has similarly recognized that letters of direction are non-disciplinary. *See Bellevue John Does 1–11 v. Bellevue School Dist. No. 405*, 120 P.3d 616, 621 (Wash. Ct. App. 2005) (noting that a letter of direction "is a practice that a district may use to respond when it views a teacher's conduct as inappropriate but not serious enough to warrant a reprimand or other discipline").

ORDER – 12

email (Dkt. No. 23-11).) Despite Miller's invitation to clarify the letter, Plaintiff declined the offer and responded, "There is no need to meet to discuss my concerns regarding the Letter of Direction. The intent is clear, albeit unfortunate." (April 26 email (Dkt. No. 23-12).) Thereafter, Plaintiff's supervisors provided further guidance, explaining that preapproval was not required for communications without "personal editorial comment," (May 2 emails Dkt. No. 23-19)), or "any other communications that are simple facts or clarifying questions regrading facts," (May 4 emails (Dkt. No. 23-20)). Harding specifically informed Plaintiff, "The letter of direction was not designed to inhibit your ability to handle the daily function of your position but to provide some guidance regarding the separation between statement of facts and opinions." (May 2 emails (Dkt. No. 23-19).) Plaintiff was also informed that a "communication that is entirely factual does not need to be reviewed prior to a response." (May 4 emails (Dkt. No. 23-17).) Moreover, Plaintiff received further clarification at the meeting on May 7 with his union representative and supervisors. (*See* Blankenship Decl. ¶¶ 10–11 (Dkt. No. 24 at 2).)

Rather than accept his supervisors' attempts to clarify the letter to ensure that its instructions did not impair performance of his job duties, the evidence shows that Plaintiff chose to create and exacerbate conflict. For example, Plaintiff rejected written clarifications from his supervisors, (*see* May 2 emails (Dkt. No. 23-19); May 4 emails (Dkt. No. 23-17)); he also rejected Miller's offer to meet and discuss clarifications upon his return from vacation, (April 26 email (Dkt. No. 23-12)); he continued to request approval for mundane, factual communications, (*see, e.g.,* April 25, 26 emails (Dkt. No. 28-2 at 15)); and he unilaterally declared that he could no longer perform some of his job duties, (March 31 email (Dkt. No. 23-10)). Finally, Plaintiff tendered his resignation, which he described as a "constructive termination," without making a good faith effort to resolve the circumstances that he apparently believed prevented him from performing his duties, (*see* May 28 email (Dkt. No. 23-23)); and he refused to accept his supervisor's response, which informed him that his "employment had not been terminated," (*see* May 30 email (Dkt. No. 23-24)). Given this sequence of events, no reasonable jury could find that Defendants' conduct was "reasonably likely to deter" Plaintiff from engaging in protected speech. On these facts,

ORDER – 13

Plaintiff's continued belief that he was unable to perform his job duties and was being retaliated against was simply not reasonable.

Plaintiff contends that "Defendants criticized and thwarted his attempts to comply with the letter of direction" by, for example, failing to timely respond to his request for assistance regarding the meeting with the PTA parents. (Resp. 16 (Dkt. No. 27).) This contention is disingenuous at best. At 4:50 p.m., Plaintiff sent an email to his supervisors requesting guidance for the PTA meeting to be held the next morning at 9:00 a.m. (March 29 authorization emails (Dkt. No. 28-2 at 12–13).) Miller responded to Plaintiff's email shortly thereafter, at 5:51 p.m., indicating that Plaintiff could handle the PTA meeting alone. (*See id.*) Given that Plaintiff's email was sent a mere *ten minutes* before the end of the work day and that Miller responded in an hour, his assertion that his supervisors failed to timely respond to his request is unsupportable. Plaintiff also asserts that Defendants began reducing his job responsibilities after issuing the Letter of Direction. (Resp. 17 (Dkt. No. 27).) The Court appreciates that Plaintiff "strongly disagrees with Defendants' position that he removed himself from these duties." (*Id.*) Nevertheless, the evidence demonstrates that Plaintiff did, in fact, remove himself from a number of his duties. Prior to leaving on vacation, Plaintiff emailed his supervisors and stated, "I am formally notifying you that I will not return to the Emergency Operations Center to serve as Incident Commander 'until further notice.'" (March 31 email (Dkt. No. 23-10).) Plaintiff then rejected Miller's invitation to meet and discuss his concerns regarding the Letter of Direction and his job duties. (*See* April 4 email (Dkt. No. 23-11); (April 26 email (Dkt. No. 23-12).) This cannot be considered conduct *by Defendants* that was designed to thwart Plaintiff's compliance with the Letter of Direction.

In sum, Defendants actions were not "reasonably likely to deter" Plaintiff's exercise of his free speech rights. Plaintiff's First Amendment retaliation claim therefore fails because he has not established a triable issue as to whether he suffered "adverse employment action." *See Coszalter*, 320 F.3d at 973; *Nunez*, 147 F.3d at 874. Accordingly, summary judgment dismissal of Plaintiff's First Amendment claim under 42 U.S.C. § 1983 is warranted.

ORDER – 14

**B.     Wrongful Discharge in Violation of Public Policy**

Plaintiff also asserts a state law claim, alleging that Defendants wrongfully discharged him in violation of public policy. To succeed on a claim for wrongful discharge in violation of public policy, Plaintiff must prove that: (1) a clear public policy exists; (2) discouraging the conduct in which Plaintiff engaged would jeopardize the public policy; (3) the public-policy-linked conduct caused the dismissal; and (4) Defendants are unable to offer an overriding justification for the dismissal. *Gardner v. Loomis Armored*, 913 P.2d 377, 382 (Wash. 1996). "An employee's voluntary resignation obviously will defeat a claim for wrongful termination." *Molsness v. City of Walla Walla*, 928 P.2d 1108, 1110 (Wash. Ct. App. 1996). Thus, as Plaintiff recognizes, he must establish that he was constructively discharged to avoid summary judgment dismissal of his claim for wrongful discharge. *See id.*

To establish constructive discharge, the employee must show "a deliberate act by the employer that made his working conditions so intolerable that a reasonable person would have felt compelled to resign." *Washington v. Boeing Co.*, 19 P.3d 1041, 1049 (Wash. Ct. App. 2000). An employee may establish constructive discharge by presenting evidence of "aggravating circumstances" or a "pattern of discriminatory treatment" by the employer. *Sneed v. Barna*, 912 P.2d 1035, 1039 (Wash. Ct. App. 1996) (citation omitted). Washington courts apply an objective test to determine whether the circumstances created a constructive discharge. *Molsness*, 913 P.2d at 1110. "A resignation is presumed to be voluntary, and the claimant bears the burden to rebut that presumption." *Id.*

In this case, Plaintiff has failed to present evidence that the District deliberately made his working conditions "so intolerable" that a reasonable person would have felt compelled to resign, let alone present sufficient evidence to rebut the *presumption* that his resignation was voluntary. *See Boeing*, 19 P.3d at 1049. The sequence of events aptly demonstrates that it was Plaintiff, not the District, who voluntarily chose to end the employment relationship. The District did not ask for Plaintiff's resignation, nor did it discipline him. On numerous occasions, Plaintiff's supervisors attempted to provide him with guidance on the intent and purpose of the Letter of Directive. In response to Plaintiff's concerns about conflicts

ORDER – 15

between the letter and his job duties, Miller offered to meet with him, but he rejected the invitation. Even after Plaintiff notified Miller that his last day with the District would be June 11, 2007, she gave him an opportunity to remain working, informing him that his employment had *not* been terminated. Nevertheless, Plaintiff chose to resign and began working for another employer on June 12, 2007. (Zandberg Dep. 7:8–20 (Dkt. No. 23-36 at 3).) Even viewed in his favor, the evidence in this case does not support Plaintiff's allegations of constructive discharge. Accordingly, Plaintiff's claim for wrongful discharge in violation of public policy fails as a matter of law. *See Molsness*, 913 P.2d at 1110 ("An employee's voluntary resignation obviously will defeat a claim for wrongful termination.").

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Dkt. No. 22) is hereby GRANTED. Accordingly, Plaintiff's complaint is DISMISSED with prejudice and the Clerk is directed to close the case.

SO ORDERED this 9th day of April, 2009.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER – 16